**ARMCO STEEL CORPORATION,**
Plaintiff,

v.

**Robert C. WATSON, Commissioner of Patents, Defendant.**

**Civ. A. No. 104-59.**

United States District Court
District of Columbia.

Nov. 14, 1960.

Felix M. de Rosa, Washington, D. C., John W. Melville, Cincinnati, Ohio, and John C. Griffin, Middletown, Ohio, for plaintiff.

George C. Roeming, Washington, D. C., for defendant.

HOLTZOFF, District Judge.

This is an action against the Commissioner of Patents to direct that he issue to the plaintiff two trade-mark registrations. The applications in question are Numbers 16087, filed on September 21, 1956; and 16088, filed on the same day. The plaintiff is a manufacturer of stainless steel, among other things. The two trade-marks which it seeks to register are 17–4 PH, and 17–7 PH, and are intended to designate the particular brands of stainless steel products it manufactures and sells. The applications were denied by the Patent Office on the ground, in effect, that these marks are descriptive, because the letters PH mean "precipitation hardening", and the figures are claimed to signify the proportions of the constituents of the alloys. Further it was held by the Patent Office, that, in effect, these marks identify the grade of the product rather than denote the particular goods of the plaintiff.

In applying the law to the facts of this case it is first necessary to recapitulate the applicable principles. A trade-mark is an arbitrary symbol, word, or phrase that is devised and used by a manufacturer or a dealer to designate his goods, and that is understood by the consuming public as denoting these particu-

lar products and as distinguishing them from other commodities of a similar kind. A person may not, however, adopt for this purpose some word that has been previously known and that has a definite significance of its own. The manner in which this doctrine is sometimes phrased is that no one may appropriate a descriptive or a geographical term as a trade-mark. One may concoct and employ only an arbitrary conglomeration of letters, newly coined and previously nonexistent and unknown. The reason for this principle is that it would be intolerable to permit anyone to monopolize and exclude others from using existing words having well understood meanings and connotations. Words listed in the dictionary are in the public domain. Everyone is entitled to use them. If as a result of continuous use, the trade-mark in the course of time becomes associated in the mind of the consuming public with the owner's goods, he acquires a property right in it in connection and only in connection with his business.

■ The rule that descriptive or geographical terms may not be used as trade-marks is, however, subject to a limitation. If the mark by which the applicant for registration denotes his product has been used for such a long period of time and so comprehensively and exclusively that it has come to mean his product in the eyes of the public, so that whenever the words are used they call up in the minds of the consuming public the applicant's goods, the words, though originally descriptive, may still be employed as a trade-mark. At times it is said, perhaps inaccurately, that under these circumstances the term acquires a secondary meaning.

A leading case on this point is a decision of the Sixth Circuit, G. & C. Merriam Co. v. Saalfield, 198 F. 369, 373. In that case, Judge Denison, who in his day was known for his decisions in the patent and trade-mark field, summarizes these principles in a manner that makes it worthwhile to quote at some length from his opinion. He said:

"Primarily, it would seem that one might appropriate to himself for his goods any word or phrase that he chose; but this is not so, because the broader public right prevails, and one may not appropriate to his own exclusive use a word which already belongs to the public and so may be used by any one of the public. Hence comes the rule, first formulated in trade-mark cases, that there can be no exclusive appropriation of geographical words or words of quality. This is because such words are, or may be, aptly descriptive, and one may properly use for his own product any descriptive words, because such words are of public or common right. It soon developed that this latter rule, literally applied in all cases, would encourage commercial fraud, and that such universal application could not be tolerated by courts of equity; hence came the 'secondary meaning' theory. There is nothing abstruse or complicated about this theory, however difficult its application may sometimes be. It contemplates that a word or phrase originally, and in that sense primarily, incapable of exclusive appropriation with reference to an article on the market, because geographically or otherwise descriptive, might nevertheless have been used so long and so exclusively by one producer with reference to his article that, in that trade and to that branch of the purchasing public, the word or phrase had come to mean that the article was his product; in other words, had come to be, to them, his trade-mark. So it was said that the word had come to have a secondary meaning, although this phrase, 'secondary meaning' seems not happily chosen, because, in the limited field, this new meaning is primary rather than secondary; that is to say, it is, in that field, the natural meaning."

■ Applying these principles to the case at bar, we are confronted with the question of fact whether these marks

have acquired a secondary meaning. The evidence may be briefly summarized. It appears that these trade-marks have been used by the plaintiff since about 1949. They are stamped on sheet products and they are used in the form of a tag attached to bundles of bar products. All of the catalogs, brochures and other pamphlets—and there are many of them —issued by the plaintiff use the trade-marks to designate these goods. All of its advertising matter does likewise. Over $500,000 has been spent by the plaintiff during the past ten years to advertise these products under these trade-marks. The sales of the company amounted to about $5,000,000 last year.

To show that the consuming public recognizes these trade-marks as such, a number of representatives of purchasers were called as witnesses, each of whom testified that these marks are known in the trade as denoting the plaintiff's goods, and are so associated in the minds of the consuming public. Specifications prepared by purchasers use these trade-marks to signify the plaintiff's products. The plaintiff produced a series of orders received from customers, all of which referred to these trade-marks. The plaintiff has licensed a number of foundries to make castings from ingots purchased from the plaintiff, under the plaintiff's patents and under his trade-marks. Editors of two principal trade journals in this field were called as witnesses, both of whom testified that these trade-marks are known in the trade as denoting the plaintiff's goods and are not associated in the minds of the public with any other product; and further that whenever anyone in the trade sees these trade-marks, he automatically assumes that they refer to the plaintiff's products. The Court finds as a fact that the plaintiff's trade-marks have acquired a secondary meaning and, therefore, are entitled to recognition and registration.

In arriving at a conclusion contrary to that reached by the Patent Office, the Court is not in fact overruling the decision of the Patent Office. The Patent Office did not have the benefit of the evidence introduced at this trial, and it may well be that it might have reached a different conclusion if this evidence had been available to it. In this respect review by this Court of decisions of the Patent Office is somewhat anomalous. In respect to actions of some other administrative agencies, this Court and the Court of Appeals are empowered to remit the case to the agency for consideration of the new evidence. This may not be done in cases relating to patents and trade-marks. The Court wishes that the statute permitted it to do so.

Accordingly, the Court will render judgment in favor of the plaintiff as to both trade-marks. A transcript of this oral decision may be considered as the findings of fact and conclusions of law. The Court wishes to thank counsel for both sides for their very helpful and able presentation of this matter. You may submit a formal judgment.