PATHFINDER COMMUNICATIONS CORPORATION, Plaintiff,

v.

MIDWEST COMMUNICATIONS CO. d/b/a WMCZ, Defendant.

Civ. No. F 84–217.

United States District Court, N.D. Indiana, Fort Wayne Division.

Aug. 30, 1984.

James P. Fenton and Ronald J. Ehinger, Barrett, Barrett & McNagny, Fort Wayne, Ind., for plaintiff.

Richard J. Sullivan, Decatur, Ind., Earl R. Stanley and Kenneth E. Satten, Washington, D.C., for defendant.

## ORDER

LEE, District Judge.

This matter is before the court on plaintiff's Motion for Preliminary Injunction, filed July 18, 1984. A status conference was held July 20, 1984 at 9:30 a.m. An evidentiary hearing was set for and held August 7, 1984 at 9:00 a.m. Prehearing and post hearing briefs were invited and received by the court. For the following reasons, the court, having examined the entire record and having determined the credibility of the witnesses after viewing their demeanor and considering their interests, will grant plaintiff's motion for preliminary injunction.

### Discussion

A party seeking a preliminary injunction bears the burden of establishing:

(1) Whether the plaintiff has at least a reasonable likelihood of success on the merits;

(2) Whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue;

(3) Whether the threatened injury to the plaintiff outweighs the threatened harm issuance of the injunction may inflict on the defendant;

(4) Whether the grant of a preliminary injunction will disserve the public interest.

*Hillhaven Corp. v. Wisconsin Dept. of Health and Social Services*, 733 F.2d 1224, 1225 (7th Cir.1984). *Accord Technical Publishing Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136 (7th Cir.1984); *Singer v. P.R. Mallory & Co.*, 671 F.2d 232 (7th Cir.1982); *Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Products*, 545 F.2d 1096 (7th Cir.1976). "Likelihood of success on the merits is sometimes considered the most significant of these factors." *Hillhaven*, 733 F.2d at 1225. The same four-pronged test is to be applied whether the request is for a temporary restraining order or for a preliminary injunction. *United States v. Phillips*, 527 F.Supp. 1340, 1343 (N.D.Ill. 1980). *See also Mattress Manufacturing Co. v. Duncan*, 486 F.Supp. 1047 (N.D.Ill. 1980); *Hughes v. Cristofane*, 486 F.Supp. 541 (D.Md.1980). A preliminary injunction is an extraordinary remedy. *Perry v. City of Fort Wayne*, 542 F.Supp. 268, 270 (N.D. Ind.1982).

## I. LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff brought this suit under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), I.C. 24–2–1–13(a) and common law. Section 43(a) of the Lanham Act creates a federal remedy for the tort of false designation of the origin of goods. *See International Order of Job's Daughters v. Lindeburg & Co.*, 633 F.2d 912 (9th Cir. 1980), *cert. denied*, 452 U.S. 941, 101 S.Ct. 3086, 69 L.Ed.2d 956. The test for determining whether a violation of section 43(a) of the Lanham Act is proven is whether likelihood of confusion exists. *See, e.g., Henri's Food Products Co. v. Kraft, Inc.*, 717 F.2d 352 (7th Cir.1983); *Sterling Drug, Inc. v. Lincoln Laboratories*, 322 F.2d 968 (7th Cir.1963).

■ Before addressing the issue of plaintiff's likelihood of success on the merits, the court must address the preliminary

issue of which precedent to apply in determining the issue of plaintiff's likelihood of success on the merits. Plaintiff argues that this court should apply the standard enunciated by the Seventh Circuit which is the likelihood of confusion standard. The defendant argues that this court should apply the standard enunciated by the Federal Communications Commission (FCC) prior to relinquishing its role of resolving call letter disputes, which is the significant likelihood of confusion standard. The FCC rulings are not binding upon this court. Indeed, this court believes that agency rulings could not be binding upon a court which is confronted by direct precedent in its own circuit. This court is bound to apply the law of the United States Court of Appeals for the Seventh Circuit when confronted by direct precedent. *Union Carbide Corp. v. Consolidated Rail Corp.*, 517 F.Supp. 1094, 1097 (N.D.Ill.1981); *United States ex rel. Maxey v. Morris*, 440 F.Supp. 56, 59 (N.D.Ill.1977). This court will apply the established standard of the Seventh Circuit in deciding this trademark action. Implicit in the FCC's relinquishment of its role as arbiter of call letter disputes is the conclusion that, when local courts resolve call letter disputes, the law of that local forum and circuit would apply.

Thus, the issue of whether plaintiff has proven a likelihood of success on the merits depends upon the showing plaintiff has made on the question of the likelihood of confusion between the call letters "WMEE" and "WMCZ." The court must address and resolve the question of "whether it is likely that the consuming public will be confused into believing that [WMCZ's broadcast] comes from the same source as [WMEE's broadcast.]" *Henri's Food Products*, 717 F.2d at 354. *See also Union Carbide Corp. v. Everready, Inc.*, 531 F.2d 366 (7th Cir.1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94.

The plaintiff, in this case, must demonstrate, by a preponderance of the evidence, that the plaintiff's use of the call letters WMEE is understood by the consuming public as a specific designation of origin. *Walt-West Enterprises, Inc. v. Gannett*

*Co.*, 695 F.2d 1050, 1060 (7th Cir.1982). This is not the typical trademark case because the marks involved are radio call letters.

In most trademark cases, the public is the purchaser of the trademark owner's product. The theory behind trademark law is that in the market place, consumers will select a particular product on the force of its mark. [Citation omitted.] ... [R]adio listeners are not the radio stations' customers, but rather, they (or their collective attention) are its product. The radio stations' customers are the advertisers who pay the stations to broadcast commercial messages to the listeners. The product in this case quite literally speaks for itself. The problem arises when the product does not know its origin, or mistakenly believes it originated with a given station, or ambiguously declares its origin.

*Walt-West Enterprises*, 695 F.2d at 1061. In order to determine whether there is a likelihood of confusion in this case the court will consider the factors enunciated by the Seventh Circuit in *Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325, 1330 (7th Cir.1977).

The first factor examined is the degree of similarity between the marks. "The marks must be so similar that it is likely or probable, not just possible, that consumers, when presented with the marks singly, rather than side-by-side, would confuse [WMCZ] with the source of [WMEE.]" *Henri's Food Products*, 717 F.2d at 355. Further, the marks must be examined as a whole. *Id.*

At the evidentiary hearing, both sides produced experts to testify about the degree of similarity between the marks WMEE and WMCZ. As could be expected, the experts took diametrically opposed positions on the degree of similarity between the marks. In examining the qualifications, methodology, approach, testimony, and general demeanor, the court credits plaintiff's expert, Daniel A. Dinnsen, Ph.D., wherever there is a conflict between the

two experts. Professor Dinnsen is one of sixteen people in the country who possess his high level of expertise in the specialties of phonology and phonetics. Professor Dinnsen utilized two methods, commonly used by phonoticians and phonologists, to test the degree of similarity between the marks WMEE and WMCZ: (1) a phonetic transcription to which Professor Dinnsen applied six basic, conservative criteria; and (2) a voice print or spectographic analysis of the words WMEE and WMCZ which resulted in a spectogram. Defendant's expert also utilized the method of spectographic analysis.

Professor Dinnsen used the call letters alone; Professor Clemme placed the call letters in a context: "this is ——." Professor Clemme disagreed with Professor Dinnsen only on one particular part of Professor Dinnsen's phonetic transcription and of the spectographic analyses done by both men. The full extent of Professor Clemme's disagreement with Professor Dinnsen is that Professor Clemme believed that there is no glottal stop prior to the first E in WMEE. Professor Clemme found only this one point of disagreement even though Professor Clemme believed that it was incorrect to state the call letters by themselves for purposes of spectographic analysis. Professor Clemme's overall conclusion was that the call letters WMEE and WMCZ were inherently dissimilar to the extent that the call letters could only be confused in a gibberish situation and that under normal listening circumstances, Professor Clemme's ultimate conclusion was that there was virtually no likelihood that the two call letters could be confused.

This court has before it and had before it at the hearing, the spectographic analyses done by Professor Dinnsen and Professor Clemme. A general comparison of the two spectographs clearly demonstrates that the spectographs of the two professors appear virtually identical. Further, a comparison of both professor's spectographs of WMEE and WMCZ, looking for differences between the two words, reveals that the spectographs of WMEE and WMCZ are virtually indistinguishable. The only noticeable difference between the spectographic analyses of WMEE and WMCZ is the presence of fricatives in the spectographic analysis done by Professor Dinnsen of the call letters WMCZ. Both professors agreed that fricatives were human sounds which are difficult to perceive because of their high frequency.

Professor Dinnsen concluded, after conducting two empirical tests,[1] that the call letters WMEE and WMBCZ were overwhelmingly phonetically similar. After reviewing the empirical data before the court and the testimony presented to the court which convincingly supports the empirical test results, this court credits Professor Dinnsen's opinion that WMEE and WMCZ are marks which are overwhelmingly phonetically similar. In addition, the call letters rhyme. Any call letters which contained a combination of the E set of letters would be phonetically similar and would rhyme. The E set of letters consists of the letters: B, C, D, E, G, P, T, V, and Z. The use of any of the nine letters in the E set coupled with W and M would produce a set of call letters overwhelmingly phonetically and rythmically similar to WMEE.

Other factors which the court credits as evidence of the overwhelming similarity between the marks are the accepted fact that people perceive differences which occur at the end of words less clearly than when differences occur at the beginning of words and the accepted fact that people develop biases to particular sounds which they have heard over a long period of time and which they expect to hear in the future such that a word which sounds similar to the word people expect to hear can be easily per-

---

1. Examination of the phonetic transcription, applying six basic criteria, clearly shows the virtually identical phonetic nature of the call letters. Defendant's expert did not produce an independent phonetic transcription, but agreed that the plaintiff's expert's transcription was reasonable, excepting the placement of a glottal stop before the first E in WMEE. The court finds the phonetic transcription and analysis convincing and reasonable, particularly as it backs up the spectographic analyses done by both professors.

ceived as the word the people expect to hear and not the word which was actually said. The differences between WMEE and WMCZ occur at the end of the words; WMEE is a recognizable mark present in this area since 1971. WMCZ has been present since July 9, 1984.

Another factor which is examined in determining whether there is a likelihood of confusion is the similarity of the products for which the name is used. There can be no doubt but that both plaintiff and defendant are engaged in radio broadcasting aimed at a particular audience and that both stations play similar music. Although the court notes that it is legal for a radio station to change its format from day to day, the testimony at the evidentiary hearing indicates that it is unlikely that either plaintiff or defendant will change their format in the near future. It would not be the normal practice of a radio station to change its format on a regular basis because of the difficulties involved. The court does not find persuasive the fact that WMCZ's official city of license is Decatur and WMEE's official city of license is Fort Wayne. The service areas overlap. WMEE's signal covers the Decatur area and WMEE solicits and receives advertising from Decatur. WMCZ is in the process of attempting to receive permission from the FCC to erect a higher tower in a location closer to Fort Wayne. If successful, the area of overlap will be significantly greater. Although at the time of the evidentiary hearing permission had not yet been granted, it is unlikely that permission will be withheld.

The manager of WMCZ readily admitted that WMCZ is attempting to focus on the demographic groups where WMEE's strength is greatest, playing similar music. Both plaintiff and defendant devote approximately forty-five minutes per hour to the playing of music. Both play music which is generally categorized as "soft rock" or "contemporary top forty." Defendant points to the fact that the official station identifications required to be given once each hour are different. The fact that official station designations of the two par-

ties are different does not alter the court's finding that the similarity of products of the plaintiff and defendant is overwhelming. Official station identifications are only given once each hour and both parties admitted that other means of identifying the two radio stations are used throughout the day; most particularly, the use of the call letters alone. The court also notes the fact that the stations, obviously, would have different on air personalities, and would likely have different unofficial promotions. The court also recognizes that the stations are not side-by-side on the FM band (WMEE is at FM 97; WMCZ is at FM 93); however, there is only one station between them. The court does not find these factors persuasive, primarily because the focus of both stations is not the news programs or public announcements or even necessarily, promotions, but, is the music played which occupies approximately forty-five minutes of every hour the stations are on the air. The court concludes that the products produced by plaintiff and defendant, looking both at the music and the targeted radio audience, are extremely similar.

The next factor to consider is the area and manner of concurrent use. The court finds that this factor also points in favor of finding that there is a likelihood of confusion by the radio public of the source of the radio station to which they are listening, whether it be WMEE or WMCZ. The overlap of the stations is not substantial at this point. However, WMEE's signal reaches the audience of WMCZ, even in its current location. If WMCZ receives permission from the FCC to move its tower, the overlap of the two stations will be greatly increased. The profit of a radio station depends on advertising. WMEE solicits and receives advertisements from the listening area of WMCZ. WMCZ does not attempt to deny the fact that, in some instances, it solicits and attempts to receive advertisements from the same sources WMEE successfully solicits. The fact that the two stations have different cities of license does not lessen the fact that the competitive

distance between the products is not that great and, in fact, overlaps. If the new tower of WMCZ is built, the competitive distance between the two stations will be even less. *See Narwood Productions v. Lexington Broadcast Services Co.,* 541 F.Supp. 1243, 1250 (S.D.N.Y.1982). The area and manner of concurrent use is similar.

The fourth factor to consider is the degree of care likely to be exercised by consumers. This factor also supports the plaintiff's position. The degree of care likely to be exercised by consumers when listening to the radio must be found to be not very high. Most people are doing other things when they tune in a radio or are listening to a radio. "Indeed, because they have no financial stake in choosing a [radio station], the average member of the audience would probably devote as little attention to ascertaining the [radio station] as the average purchaser of a ball of twine." *Narwood Productions,* 541 F.Supp. at 1251. There was no testimony at the evidentiary hearing which bears out defendant's allegation that radio listeners pay particular attention to the radio station to which they are listening or that radio listeners exercise any great degree of care in choosing a radio station. This court finds that radio listeners do not pay close attention to which radio station they have chosen; "listeners have no real incentive to exercise any great care in differentiating among the symbols of the various stations." *Walt-West Enterprises,* 695 F.2d at 1062. Because radio is a purely aural medium and because consumers do not exercise a great degree of care in picking a radio station, the likelihood of confusion increases where there are similar marks used for sources of broadcasts. The court concludes that this factor tends to bear out plaintiff's assertions regarding the likelihood of confusion between the marks WMEE and WMCZ.

Another factor to consider in determining the likelihood of confusion between the two marks is the strength of WMEE's mark. The evidence at the hearing was unrefuted by the defendant that WMEE is an extremely strong arbitrary mark in the Fort Wayne market area. WMEE has used the call letters WMEE since 1971 and on the FM dial at its current location since 1979. WMEE has expended substantial time, effort and expense (approximately $300,000) to bring its mark before the Fort Wayne market area and to imprint the mark upon radio listeners. WMEE introduced substantial evidence into the record of publicity given to WMEE by area newspapers in which WMEE is always identified by its call letters. WMEE does have another promotional slogan. However, the slogan is used in conjunction with its call letters WMEE. WMEE is the number one radio station in the Fort Wayne market area as rated by Arbitron, the national rating service for radio stations, for the period of Spring 1984. The strength of WMEE's mark is demonstrated by the fact that when the defendant considered changing its call letters in June of 1984 to WMCZ, the only radio station contacted about that change was WMEE. Defendant, thus, was aware of the dominant soft rock music station in the area. The defendant was also aware that WMEE was not only the dominant rock station in the area, but also was the number one radio station in the area. The court concludes that the plaintiff's mark, WMEE, is an extremely strong arbitrary mark in the Fort Wayne market area.

Another factor to consider is actual confusion. No evidence of actual confusion is required to prove a likelihood of confusion. *Ideal Industries, Inc., Plaintiff-Appellee v. Gardner Bender, Inc., Defendant-Appellant,* 612 F.2d 1018 at 1024 (7th Cir.1979). The court agrees with the plaintiff's argument that evidence of actual confusion would be difficult to obtain in a case such as this. About the only possible way actual confusion could be shown would be through examination of Arbitron ratings diaries. However, the next Arbitron ratings period does not begin until September 20, 1984. WMCZ has only been using its call letters WMCZ since July 9, 1984 and thus, was not rated, as WMCZ, in the last

Arbitron ratings period. Another factor which would cause it to be difficult to obtain evidence of actual confusion is the fact, earlier discussed, that radio listeners do not pay particular attention to the radio station that they have picked or chosen.

The only evidence of confusion which was presented at the evidentiary hearing was the confusion evidenced by the manager of WMCZ. During a taped discussion with plaintiff's attorney, while his attorney was present, the manager of defendant's radio station was asked to give WMEE's slogan. The manager of WMCZ responded with the slogan used by WMCZ, not the slogan used by WMEE. On the tape it is clear that the word "WMEE" was clearly enunciated in the question to the defendant. The court finds that the defendant confused the word "WMEE" with his own radio station "WMCZ." There can be no doubt but that a manager of a radio station would have considerably more sophistication than the average radio listener and yet, that sophisticated listener confused the call letters WMEE and WMCZ. The court does not credit the explanation given by the manager that he was focusing on format rather than on the question itself. The question was spoken in a quiet room with no background noise. While this was only one isolated incident and therefore, not wholly persuasive to the court that actual confusion exists in the market, it does cause the court to conclude that factor does not militate against plaintiff's position that likelihood of confusion exists or could exist.

The final factor to be considered is the intent on the part of the alleged infringer to palm off his products as those of another. Intent is a factor, but it is not a necessary factor. *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb, Inc.*, 698 F.2d 862 at 867 (7th Cir.1983). The evidence shows that the defendant was aware of the similarity between the marks of the number one radio station in the Fort Wayne market area, WMEE and the call letters it proposed to use, WMCZ. The employee of WMCZ who thought up the call letters told the manager of WMCZ that the employee thought the letters WMCZ

sounded similar to WMEE. The manager of the radio station himself testified that he also felt that the letters sounded similar, but not alike. Another point evidencing some intent on the part of defendant to prey on plaintiff's reputation and good will in the Fort Wayne market area is the fact that the defendant contacted WMEE prior to applying for and receiving permission to use the call letters WMCZ. The defendant was also aware that the FCC no longer involved itself in the determination of similarities between call letters of radio stations in common or overlapping broadcast areas. WMEE requested that the defendant not take the call letters. WMCZ proceeded to receive permission from the FCC to utilize the call letters WMCZ. The court cannot conclude at this time that the defendant deliberately, in bad faith, chose to take the call letters WMCZ. However, the record does indicate that there is at least some intent on the part of the defendant to trade on the good will and reputation of WMEE, the number one radio station in the Fort Wayne market area. The defendant had to be aware that it certainly would not hurt the radio station WMCZ if listeners confused it with WMEE and tuned in WMCZ because they thought they were listening to WMEE. *See Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 613 (7th Cir.1965).

Taken as a whole, the seven factors utilized by the Seventh Circuit to determine the issue of likelihood of confusion in a trademark case point overwhelmingly to the conclusion that there is a likelihood of confusion shown in this case. Even if this court were to utilize the FCC standard which requires the significant likelihood of confusion, the court's conclusion would be the same. There is an overwhelming likelihood of confusion between the marks WMEE and WMCZ. Plaintiff has sufficiently demonstrated a likelihood of success on the merits at trial.

## II. IRREPARABLE HARM

The plaintiff argues that it will be irreparably harmed if a preliminary injunction

does not issue and the defendant argues that money damages will compensate the plaintiff for any harm actually proven to be sufficient at trial. After examining the evidence presented to this court, the court finds that there is more at stake here than financial damages. A radio station is peculiarly dependent upon its reputation and good will. Radio listeners are not particularly loyal in their choices. Building up a loyal audience and retaining that audience is a difficult and expensive process. WMEE has undertaken that process since 1971 and on FM, since 1979. Defendant seems to assert that the burden of protecting its reputation rests on the plaintiff. It is true that the plaintiff bears the burden of protecting its reputation. It is not the plaintiff's burden to undertake expense in the marketplace to attempt to prevent infringement by a newcomer who adopts a confusingly similar mark. It is the duty of the newcomer to select a mark that will avoid the likelihood of confusion. *Wesley-Jessen,* 698 F.2d at 867.

"Courts readily find irreparable harm in trademark infringement cases because of the victim's inability to control the nature and quality of the infringer's goods, [citation omitted], not because the infringer's goods are necessarily inferior. Even if the infringer's goods are of high quality, the victim has the right to insist that its reputation not be imperiled by another's actions." *Id., citing Ideal Industries,* 612 F.2d at 1026 and *Processed Plastics Co. v. Warner Communications, Inc.,* 675 F.2d 852, 858 (7th Cir.1982). WMEE has lost control of its reputation by virtue of the use by defendant of confusingly similar call letters. Damage to WMEE's good will, reputation and strength of mark, caused by confusion, as evidenced here, is irreparable injury. *Helene Curtis Industries,* 560 F.2d at 1332. *See also Ideal Industries,* 612 F.2d at 1026. The *Ideal* court also held that monetary damages were likely to be inadequate compensation for the harm to the victim caused by the inability of the victim to control the nature and quality of the infringer's goods. *Id. See also Hyatt Corp. v. Hyatt Legal Services,* 736 F.2d

1153 at 1158 (7th Cir.1984) (interpreting irreparable injury under Illinois Anti-Dilution Act).

These Seventh Circuit cases cannot be distinguished away by defendant on the ground that they did not involve radio stations. Because radio is a totally aural medium, there are great "dangers inherent in confusing radio listeners regarding the source of broadcasts." Additionally, a radio listener does not pay particular attention regarding the source of the broadcast. *Walt-West Enterprises,* 695 F.2d at 1058, 1061. The dangers normally involved in trademark cases are present, perhaps to a greater degree than in normal trademark cases, in trademark cases which involve call letters of radio stations.

WMCZ is not a stereo FM station. The court credits the testimony of Walter Stephan that WMEE is a stereo FM station and would be harmed if a radio listener tuned to WMCZ, a non-stereo radio station, confused it with WMEE and was upset by the inferior quality. WMEE is in the classic trademark victim's position: it cannot adequately protect its reputation, its good will, or the strength of its trademark. The potential clearly exists for damage to plaintiff's reputation, plaintiff's good will, and plaintiff's current number one position in the Fort Wayne area market. Plaintiff has shown by a preponderance of the evidence that it will be irreparably harmed if the injunction does not issue and that money damages will not likely be adequate compensation for any harm suffered.

## III. BALANCE OF HARDSHIPS

The third element a district court must consider in determining whether a preliminary injunction is appropriate in a particular situation is whether the threatened injury to the plaintiff outweighs the threatened harm issuance of the injunction may inflict on the defendant. *See Omega Satellite Products v. City of Indianapolis,* 694 F.2d 119, 123 (7th Cir.1982). The defendant characterizes plaintiff's potential injury in this matter as minimal and speculative. The defendant describes its own harm if it

were instructed to change its call letters as clear and definite. The court agrees that there is a clear and definite harm present in this case. However, the clear and definite harm which is threatened is a clear and definite harm to the plaintiff, not the defendant. The process of obtaining new call letters is a simple one and a relatively inexpensive one. The court notes that the only real harm defendant can point to is the potential harm if they are forced to relinquish the call letters WMCZ prior to receiving new authorized call letters from the FCC. Plaintiff is not requesting an injunction which would prohibit the defendant from broadcasting altogether. The plaintiff's request is that the defendant be enjoined from using the call letters WMCZ or any other call letters confusingly similar to plaintiff's call letters, WMEE. Plaintiff suggests that, if a preliminary injunction issues, that defendant be allowed to continue broadcasting until new call letters can be obtained. The court will not impose the substantial hardship of prohibiting the defendant from broadcasting altogether while new call letters are being obtained. The court, however, will require the defendant to use a disclaimer in connection with its call letters while obtaining new call letters. That disclaimer will be detailed below.

The defendant testified that the legal fees involved in obtaining new call letters are approximately $700 to $800. A newcomer entering the field has a duty to select a mark that will avoid confusion. *Wesley-Jessen*, 698 F.2d at 867. The defendant was aware that the call letters WMCZ sounded similar to the call letters WMEE. Defendant was further aware that WMEE was a strong, prominent mark in the Fort Wayne area, in fact, the mark of the number one radio station in the Spring of 1984. Although the defendant did not know exact figures, defendant was also aware that plaintiff had expended substantial time and expense promoting its mark. That expense figure is $300,000. In short, defendant knew that there was at least some similarity between the marks and thus, defendant had a duty to select a trademark that would have avoided confu-

sion. Defendant must bear the expense of obtaining call letters which are not confusingly similar to those of the plaintiff. WMEE has the right to insist that its reputation not be imperiled by the acts of another. *Processed Plastic Co.*, 675 F.2d at 858. Defendant could have avoided the expense of obtaining this new set of call letters had it chosen unconfusing call letters in late June of 1984. The only other expense defendant points to is an expense of $1200.00 for stationery bearing the WMCZ mark. Again, this expense is not that great and was an expense defendant could have avoided if it had picked unconfusing call letters to begin with.

Balancing the relative harms and hardships of the parties, it becomes clear that the potential harm of irreparable injury which exists to plaintiff's reputation, good will, and strength of its mark far outweighs any monetary hardship which defendant might incur. The court will not force the defendant off the air while it is obtaining new call letters. The hardships which defendant detail do not warrant denial of preliminary relief to WMEE. *See Ideal Industries*, 612 F.2d at 1026. The defendant simply cannot use some limited financial expense as a justification for denial of preliminary relief in this case where a strong likelihood of success on the merits has been shown and a strong potential for irreparable injury has been shown. *Processed Plastic Co.*, 675 F.2d at 859. *See also Omega*, 694 F.2d at 123.

## IV. PUBLIC INTEREST

The final element in the granting of any request for preliminary injunctive relief is whether the grant of a preliminary injunction will disserve the public interest. The question which must be addressed and resolved under this fourth element "is not whether the public interest will be served, but whether the public interest will be dis served." *Wesley-Jessen*, 698 F.2d at 868 (emphasis in original). In examining the current record before this court and the court's prior analysis, findings and conclusions contained in this order, it is clear to this court that there is a likelihood of con-

fusion to the public as to the source of broadcasts of the radio stations WMEE and WMCZ. WMCZ has only been on the air since July 9, 1984 as WMCZ. It still broadcasts during the day with its sister station WADM–AM. Defendant's only argument on the element of public interest is that if defendant ultimately prevails in the lawsuit, it will be confusing to its listeners if it attempts to revert to the call letters WMCZ. This argument is speculative at best. The court is confronted with the situation where there is a likelihood of public confusion demonstrated in the Fort Wayne radio market area. The public will benefit by the termination of the existing likelihood of confusion present in this case. Public interest would be disserved if this injunction does not issue. Defendant has not presented any persuasive arguments to the contrary. It is still early enough in defendant's use of the call letters WMCZ that it is unlikely that those letters are imprinted upon radio listeners who happen to listen to the defendant's FM radio station, particularly in light of the fact that defendant simulcasts with an older established radio station with established call letters. Plaintiff has met its burden of showing by a preponderance of the evidence that the public interest will be served by the granting of a preliminary injunction.

## V. REQUESTED RELIEF

Accordingly, based on the foregoing, plaintiff's motion for preliminary injunction is hereby GRANTED. The defendant is hereby ENJOINED from using the call letters WMCZ to identify its FM radio station over the air except for that period of time necessary to obtain new call letters as required by the Federal Communications Commission. During that period of time, which is hereby ORDERED to be as short as possible, whenever the call letters WMCZ are used in any form or in any medium, the identification of the radio station shall be followed with the disclaimer: "Not to be confused with WMEE, FM–97." Defendant is FURTHER ENJOINED from using or picking any call letters which are confusingly similar to plaintiff's call letters. Defendant is ENJOINED from

choosing any call letters which are combinations of any of the E set of letters as detailed above in conjunction with the letters WM. Defendant shall file with this court evidence of its immediate application to the Federal Communications Commission for new call letters and shall inform the court through specific filings of the progress of its application and the granting of new call letters to defendant.