**FRANCES DENNEY, INC., Plaintiff,**

v.

**NEW PROCESS COMPANY, Defendant.**

**Civ. A. No. 84–0062–L.**

United States District Court,
W.D. Virginia,
Lynchburg Division.

Jan. 25, 1985.

Laurence P. Morin, Lynchburg, Va., Robert G. McMorrow, Cynthia C. Dale, Sughrue, Mion, Zinn, MacPeak & Seas, Washington, D.C., D. Paul Weaver, Kimmel, Crowell & Weaver, Arlington, Va., for plaintiff.

Bernard C. Baldwin, III, Edmunds & Williams, Lynchburg, Va., James L. Dooley, W. Warren Taltavull and Susan Brown, Washington, D.C., for defendant.

## MEMORANDUM OPINION

KISER, District Judge.

This action for trademark infringement and unfair competition was brought before this Court for trial on September 25, 1984. The Court's jurisdiction was proper under 28 U.S.C. § 1338(a) and (b). All proposed findings of fact and conclusions of law have been submitted; thus, this matter is now ripe for disposition.

## I. PARTIES

The Plaintiff in this action is Frances Denney, Inc., (hereinafter Denney, Inc.), a Delaware corporation with its principal place of business in Lynchburg, Virginia. The President and Chief Executive Officer is Theodore J. Munchak who acquired Denney, Inc. in January, 1983. In October, 1980 Mr. Munchak had acquired The Merchandising Company doing business as BLAIR and became its President, Chairman of the Board and Chief Executive Officer. Denney, Inc. purchased The Merchandising Company in 1983. The subject of this action is the trademark and trade name BLAIR which is associated with The Merchandising Company division of Denney, Inc.

The BLAIR division is in the business of marketing door-to-door various consumer products and household items through individual BLAIR dealers. These dealers are recruited through the use of direct mailings. All consumer purchases must be made through dealers who often are also some of the best customer-consumers.

The Defendant in this action is the New Process Company (hereinafter New Process) which is a Delaware corporation with its principal place of business in Warren, Pennsylvania. Throughout the history of the company, it has been owned and operated by individuals with the surname Blair. From 1924 until 1981, the predominant trade name was NEW PROCESS Company, but in September of 1981 the trade name was changed to BLAIR. Since the inception of the business in 1910, one or the other of the names JOHN BLAIR or JOHN L. BLAIR has been consistently used by the Defendant in the sales literature of its wearing apparel. There are no parent, subsidiary or other related companies. All of the offices and facilities of New Process are located in Pennsylvania. They do *not* manufacture any products but are in the business of merchandising through direct mail catalogs. The primary product line has been wearing apparel; however, there is some evidence of expansion into small home furnishings or household items.

At issue in this case is the right to the use of the trademark and trade name BLAIR in the simpliciter form. The Plaintiff claims that it has established superior rights to the mark and name BLAIR and that the Defendants are currently infringing on those rights. The Defendant has counterclaimed alleging its longtime use of various plays on the word BLAIR as trademark in apparel field gives them enforceable rights as to the use of BLAIR standing alone in the apparel field. While many of the essential facts of this action are undisputed, a thorough development is crucial to the resolution of this dispute.

## II. FINDINGS OF FACT

Denney, Inc. and its predecessors in title have been trading under the marks DR. BLAIR'S, BLAIR LABORATORIES and BLAIR'S OF VIRGINIA, and other marks the dominant part of which has been BLAIR, from its inception in 1909 to the

present, at least with regard to cosmetics, pharmaceutical preparations and medicinal preparations. Six of Denney, Inc.'s trademark and service mark registrations issued by the U.S. Patent and Trademark Office indicate that the mark BLAIR appearing alone has been used at least as far back as 1944 with regard to the specific goods listed in those registrations.[1] The present lettering style of Denney, Inc.'s service mark, trade name and trademark BLAIR was first used in 1956 and has been in continuous use since 1956 until the present.

One feature which distinguishes the parties in this action is their respective methods of marketing. As mentioned earlier, the Plaintiff is in the business of marketing door-to-door various consumer items. These door-to-door representatives or deal-ers, who are regular customers themselves, are recruited through direct mailings. If the individuals respond to the direct mailing, they are provided a kit, order book, free gift and current BLAIR catalogs. Once they have remitted six or eight orders, they are considered active BLAIR dealers. This active status is maintained by soliciting an order within the prior six or eight months. At the time of trial, DENNEY, INC. had approximately sixty thousand (60,000) active dealers in the fifty (50) states.

If a dealer demonstrates his credit worthiness, he will be extended credit; however, other customers are never given credit by the Plaintiff. As an additional incentive, dealers are often offered free gifts or special item offerings in return for their

1.

| Registration No. | Date of 1st Use | Date of Issuance | Goods & Services |
|---|---|---|---|
| 541,104 | 1/01/49 | 4/17/51 | Liniment, bitter herb compound, laxative chewing gum, cough syrup, vitamin tablets, medicated salve for the chest and throat, castoria, hygienic powder, antiseptic skin ointment, liniment and carminative, toothache drops, burn ointment, milk of magnesia tablets, aspirin tablets, A.P.C. tablets, corn remedy, foot comfort salve, athlete's foot aid salve, antiseptic mouth wash, and antiseptic medicated skin cream. |
| * 543,028 | 1/01/49 | 5/29/51 | Vanishing cream, cleansing cream, cold cream, lemon cleansing cream, witch hazel cream, perfumes, creme powder, sachet powder, all-purpose lotion, hand lotion, hand cream, bath crystals, deodorant cream, cologne, deodorant cologne, toothpaste, liquid dentrifice, brilliantine, hair dress cream, hair tonic, liquid preparation used in setting waves in the hair, shaving cream, and shaving lotion. |
| 574,107 | 10/01/48 | 5/05/83 | Food flavoring extracts and fruit flavoring used for food purposes; pie filling mix comprised principally of cornstarch, sugar and egg yolk, table syrup flavoring, and spices. |
| * 595,380 | 1944 | 9/21/54 | Air freshener, refrigerator air deodorant, bluing, moth proof, perfumed starch, and household disinfectant. |
| * 596,554 | 1944 | 10/21/54 | Silver polish, stove polish, furniture polish, cream furniture polish, silicone furniture polish, floor wax and a cleaner and polish for glass, brass, porcelain, and chromium. |
| 1,262,049 | | | Door-to-door retail merchandising of various goods, including cosmetics, toiletries, jewelry, glassware, stationery, gift items and the like. |

* Incontestable.

service. Items of wearing apparel have through the years been one of the staple incentive gifts. The evidence indicated that dealer turnover is approximately 125% per year. While DENNEY, INC. does advertise, the vast majority of their advertising is directed toward the recruitment of new dealers. As indicated earlier, the dealers are an essential feature of the marketing because all consumer purchases must be made through the dealers.

Potential customers are shown the BLAIR catalog by the dealers from which the consumer can make their selections. The primary market is the lower income levels of society with the average price of items in the $3–$4 range. Once a selection is made, the dealer fills out the BLAIR order form and remits it to the central office. The dealer purchases at wholesale and then sells to the public at a suggested retail price, the difference being his profit. The goods are then shipped to the dealer in BLAIR boxes. The dealer in turn delivers the goods to the customers. The catalogs and products are always mailed to the dealers and not the ordinary consumer.

New Process on the other hand markets its goods directly to the ultimate customer through direct mail catalogs. They do not utilize the dealer method of marketing. Any consumer may place an order.

Another distinguishing feature is the difference in product lines. From the inception of the Plaintiff in 1909, they have sold a variety of consumer items primarily in the lines of cosmetics, toiletries, medicinal preparations, health care products, cleansing products, food products and other sundry household goods. At least as far back

as 1954 there is some evidence that Denney, Inc. also offered items such as nylon hosiery, sweaters, scarves, rain bonnets, socks, bedroom slippers, and other items of clothing whether considered wearing apparel or accessories.

The evidence also indicates that most, if not all, of these offerings were incentive offers or promotional items for the dealers and were not made available to the ordinary consumer. At any rate, it is undisputed that none of these items of apparel ever carried a sewn-in BLAIR label. On occasion, the products would be delivered in BLAIR bags; however, only if the dealers ordered the bags. Given Denney, Inc.'s method of marketing, the BLAIR order forms and BLAIR shipment boxes would always be received by an individual BLAIR dealer. The evidence also indicated that Denney, Inc. began to more fully develop its line of wearing apparel in 1981 and that this was the first time that a BLAIR gum sticker was placed on a garment. (Ex. 24)

Prior to 1981, wearing apparel occupied a small percentage of the Denney, Inc. product line. This was characterized by the Plaintiff's witnesses as a major expansion.

New Process also traces its beginnings to the early 20th century. Their major product line has been wearing apparel. They have been in direct mail retailing of men's and women's apparel since 1910. New Process is the owner of six (6) incontestable trademark and servicemark registrations issued by the U.S. Patent and Trademark Office in the early 1960s, all of which prominently contain the BLAIR name.[2] These all apply to items of wearing

| 2. | Mark | Reg. No. | Issue Date | Goods & Services |
|---|---|---|---|---|
| | * JOHN BLAIR | 790,047 | 5/25/65 | Men's and boy's outer shirts. |
| | * BLAIR PRESS | 893,345 | 6/23/70 | Wash and wear finish with which men's and women's slacks have been treated. |
| | * JOHN BLAIR | 910,968 | 4/06/71 | Men's and boy's outer shirts, sweaters, sport jackets, casual jackets and blazers. |
| | * JOHN BLAIR | 930,561 | 3/07/72 | Men's neckties and men's slacks. |
| | * BLAIR-GUARD | 1,051,930 | 11/02/76 | Overcoats, raincoats, parkas and fabric jackets having a protective finish which makes them repel water and stains. |

apparel and more recently home furnishings. It is uncontested that New Process first used BLAIR in the simpliciter form as a trademark or servicemark in connection with any goods or services on September 13, 1981. Prior to 1981, the Defendant operated primarily under the assumed name of New Process before changing to BLAIR. As early as the mid–1920s, New Process affixed labels bearing John Blair to clothing. They first used BLAIR alone as a trademark for items of wearing apparel in January of 1983.

The year of 1981 appears to be the crucial time frame in this action. It was in 1981 that New Process realized the need to infuse their mailing list with new names. In order to further this goal, Defendant hired an outside advertising agency, "Grey Direct", to assist it in broadening its market. In June, 1981 the recommendation was made by "Grey Direct" to change the assumed name to BLAIR from NEW PROCESS and to change the logo to BLAIR on all of its products. Although the decisions were made at that time, it was a gradual change. It was not until January, 1983 that the new BLAIR logo appeared on labels of wearing apparel. New Process representatives admitted at trial that they had been aware of the Lynchburg, Virginia BLAIR company, i.e. DENNEY, INC., as far back as February, 1967, but they felt that this was of little concern due to the differences in product lines and marketing techniques. According to Mr. Alan Blair of New Process, they felt they had their area in apparel and the Plaintiffs had their area of specialty.

Mr. Munchak testified that he became aware of the change from JOHN BLAIR to BLAIR approximately 1½ years prior to trial. As long as New Process marketed its wearing apparel under the JOHN BLAIR label there was no problem; however, he testified that the change created confusion. Denney, Inc.'s customer service supervisor, Ms. Pamela Ernst, testified that her particular office kept records of all misdirected correspondence, payments and orders. Since April, 1983 her records indicated that there had been on an average in excess of 30 misdirected pieces per month.[3] Some, but not all, of the misdirected mailings were intended for New Process. She testified that her office developed the policy of sending form letters back to the originators of the misdirected mailings and that Denney, Inc. paid the postage for the misdirected mail. She testified that the problem started in 1982 and has escalated since that time. Most of the misdirected mail was supposedly destined for New Process in Warren, Pennsylvania. Also there were on the average of 15 boxes of returned products per month intended for Warren, Pennsylvania BLAIR. This requires the employees of Denney, Inc. to unpack the boxes, repack them and then forward them to New Process at Denney, Inc.'s expense.

Representatives from New Process had similar statistics. Since the filing of this action, it was stated that there had been approximately 1500 misdirected mailings, approximately ⅓ of which belong to Denney, Inc.

## III. CONCLUSIONS OF LAW

The real issue in this case is which party has the right to use the name and mark "BLAIR" in simpliciter form in the area of wearing apparel. It is undisputed that the Plaintiff possesses superior rights to its use at least with regard to goods which fall into the categories of its incontestable registrations. These items seem conveniently classified as personal use items or home

| Mark | Reg. No. | Issue Date | Goods & Services |
|---|---|---|---|
| * BLAIR SHOPPE | 1,094,807 | 6/27/78 | Retail home furnishings store services. |

* Incontestable.

3.

| Misdirected Mailings | Month |
|---|---|
| 17 | April, 1983 |
| 36 | May, 1983 |
| 46 | June, 1983 |
| 8 | July, 1983 |
| 93 | August, 1983 |

use items. Likewise the Defendant has agreed to restrict the sale of their non-apparel items under the BLAIR SHOPPE mark which is also incontestable. Thus, the only areas of dispute are the marks to be used in the sale of wearing apparel and the appropriate trade name.

The problem which must be resolved is whether the Plaintiff has the exclusive right to the name and mark "BLAIR" so as to preserve for itself the right to expand its product lines or has the Defendant, by virtue of its long use of various plays on the mark BLAIR, created for itself a niche in the apparel market which cannot be infringed. Before entering this maze, perhaps it would be useful to define several of the terms.

 While trade names, trademarks, and servicemarks are often referred to interchangeably when discussing this area, they really are distinct terms denoting different concepts which should be clarified at the outset. A trade name is that name which is used by manufacturers, industrialists and merchants to identify their businesses. 15 U.S.C. § 1127. It is the name which actually symbolizes the reputation of a business. *Communications Satellite Corp. v. Comcet, Inc.*, 429 F.2d 1245, 1250 (4th Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970). A trademark is any name, word, symbol, design or any combination thereof which is adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others. 15 U.S.C. § 1127. Trademarks are normally required to be physically affixed to the products. 15 U.S.C. § 1127. A servicemark is any mark used in the sale or advertising of services so as to distinguish them from the services of others. 15 U.S.C. § 1127. While all of these are different concepts, they serve a related purpose, namely that of identifying a business and its products and services and of protecting any goodwill which has been developed for those goods and services. *American Steel Foundries v. Robertson*, 269 U.S. 372, 380, 46 S.Ct. 160, 162, 70 L.Ed. 317 (1926).

Trade names, trademarks and servicemarks are all protected by the same legal principles which are derived from common law and federal trademark law. The aim of the law in this area is to prevent subsequent users from infringing on established rights of others and causing confusion in the market place. All of the different types of infringement are separate and distinct wrongs and are in and of themselves sufficient basis for an injunction. *Communications Satellite Corp., supra.*

 Trade names are protected under the common law of the individual states. Such is also the case in Virginia. What must be established is that the name has acquired a secondary meaning and that confusion is likely. *Rosso & Mastracco, Inc. v. Giant Food Shopping Center*, 200 Va. 159, 104 S.E.2d 776, 780 (1958); *Kyhos v. Perpetual Savings and Loan Association*, 480 F.2d 204, 208 (4th Cir.1973); *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156 (4th Cir.1962). The question of infringement of the BLAIR trade name will be discussed later.

 Trademarks are protected both under state trademark law and federal trademark law; however, federal provisions are the ones most frequently invoked. If a mark is registered with the United States Patent and Trademark Office, the protection from infringement flows from Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1). Protection for an unregistered mark comes from Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Under either of these statutes the legal issues are essentially the same. First, there must be a finding that there is the likelihood of confusion.

Under that statute [15 U.S.C. § 1114(1) ], the issue is "whether the use of the accused copy or colorable imitation of the registered mark 'is likely to cause confusion, or to cause mistake, or to deceive.' " In applying the test, it is not necessary for the owner of the registered trademark to show actual confusion: "the test is whether there is likelihood of confusion."

*Pizzeria Uno Corporation v. James W. Temple, Jr., d/b/a Taco Uno,* 747 F.2d 1522, 1527 (4th Cir.1984).

Likelihood of confusion refers to any type of confusion whether it goes to the source of a party's goods or services or as to a possible association, relationship, sponsorship between the parties and/or their goods and services. *AMP, Inc. v. Foy,* 540 F.2d 1181, 1184–85 (4th Cir.1976). If confusion is found, then the logical second step is who has prior ownership rights to the particular mark in question.

To establish ownership of a mark, the prior user must establish not only that at some date in the past it has used the mark, but that such use has continued to the present.

McCarthy, *Trademark and Unfair Competition,* § 16.2 (1984 ed.).

In order to determine whether there is such a likelihood of confusion, courts generally focus on several factors for guidance. Some of these factors are:

(a) strength or distinctiveness of the mark;

(b) similarity of the two marks;

(c) similarity of the goods/services the marks identify;

(d) similarity of the facilities the two parties use in their business;

(e) similarity of the advertising used by the two parties;

(f) the defendant's intent;

(g) actual confusion.

*Pizzeria Uno, supra* at 1527.

The Fourth Circuit in the *Pizzeria Uno* case hastened to add that not all of these factors are always relevant or equally emphasized in each case. *Id.* The Court in the same opinion also noted that the paramount factor under these guidelines was the distinctiveness and strength of the mark. *Id.* With this in mind, the focus must shift to the mark in question in this action.

The mark in question is BLAIR over which both parties claim ownership. There appears to be little dispute between the parties, and I am in agreement, that the BLAIR mark in this case is a surname. Also, there is little doubt that a surname mark is treated as being an inherently non-distinctive mark thereby requiring the proof of secondary meaning before it is entitled to protection. 15 U.S.C. § 1052(e)(3); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978); McCarthy, *Trademarks and Unfair Competition,* § 13:2 (1984 ed.).

"Secondary meaning has been defined as *association,* nothing more." *Carter-Wallace, Inc. v. Proctor and Gamble Co.,* 434 F.2d 794, 802 (9th Cir.1970). "[T]he chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him a single thing coming from a single source." *Id.* "Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin." *Scott Paper Co. v. Scott's Liquid Gold, Inc., supra* at 1228. The Fourth Circuit has indicated that secondary meaning for a term is a question of fact. *Little Tavern Shops, Inc. v. Davis,* 116 F.2d 903, 906 (4th Cir.1941). In determining whether there is secondary meaning, it has focused on four factors which are significant:

(1) long use;

(2) advertising;

(3) sales volume;

(4) identity of service or origin in the minds of the purchasing public.

*Pizzeria Uno,* 747 F.2d at 1528, n. 3.

Once secondary meaning is established, the degree of protection afforded the mark should be commensurate with the degree of association. *AMF, Inc. v. Sleekcraft Boats,* 599 F.2d 341, 349 n. 12 (9th Cir. 1979). This is the general rule although under certain circumstances or conditions a trademark can develop secondary meaning as to goods and services to which the mark has not previously been applied and, therefore, develop an extended area of protection. *Scott Paper, supra,* at 1228.

Applying these principles to the case at hand, I conclude that the Plaintiff

has proven secondary meaning; however, this association in the public's mind is limited to the product areas which compose the vast majority of its market. It is clear that at least as far back as 1944 the Plaintiff has used the BLAIR mark in simpliciter form in the advertising and sale of its various consumer products. It has also as far back as 1909 used various plays on this mark in the marketing of its goods. The Plaintiff has succeeded in persuading me that through its sales volume, advertising and long use of the BLAIR mark that it has developed a secondary meaning for that mark in the public's mind with regard to its products lines.

The evidence, however, also demonstrates that the Plaintiff has never marketed apparel items to any degree of significance and the items which have been offered have been as incentive items and that today it only accounts for approximately two percent (2%) of the entire business. Therefore, this secondary meaning is limited to its lines of personal and household consumer items which are enumerated in the marks registered with the Patent and Trademark Office and does not extend to encompass wearing apparel. On these findings, I conclude that Plaintiff's BLAIR mark has no distinctiveness of its own, but is entitled to protection only to the limits of the secondary meaning.

In defining the boundaries of secondary meaning, another factor which the courts often find instructive in determining likelihood of confusion is the similarity of the goods and services. The only real issue here is that of apparel. While the Defendant does market some non-apparel items, these are marketed under the BLAIR SHOPPE registration which is incontestable and not the subject of this action. The BLAIR mark which is in question here is only used by the Defendant in relation with the sale of apparel. The record demonstrates that with respect to this mark the goods are for the most part dissimilar. Although there was evidence that the Plaintiff has offered apparel items or accessories, the vast majority were provided as incentive items for the dealers. Based upon the Plaintiff's incontestable registrations and the evidence before this Court, the Plaintiff's goods marketed under BLAIR fall under the personal and home use items such as toiletries, pharmaceuticals, medicinal preparations, cosmetics, small home furnishings and some food or cooking items. The Defendant on the other hand markets under the BLAIR mark exclusively wearing apparel. I conclude that their product lines are dissimilar.

The Plaintiff argues that it is entitled to protection for the mark under the closely related goods test or the expansion doctrine. Essentially, the argument is that likelihood of confusion increases when the non-competitive goods are closely related and the public might reasonably expect a related good to flow from the same origin or source. "The nature of the buyer's confusion in seeing similar marks on non-competitive, but related goods, is a confusion as to connection, or sponsorship." McCarthy, *Trademark and Unfair Competition*, § 24:1, p. 162 (1984 ed.). "The modern rule of law gives the trademark owner protection against use of its mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.*, § 24:3, p. 166. The Plaintiff has called my attention to numerous cases where a close relationship has been found between cosmetics and clothing so as to extend the protection of the mark into the other area.[4] These, however, are cases involving nationally known designers marketing products to a name conscious segment of the economy. In ad-

4. *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1174 (2d Cir.1976); *Gant of New Haven, Inc. v. Chez Boye Parfums International, Inc.*, 256 F.Supp. 982 (M.D.Fla.1966); *Max Factor & Co. v. Factor*, 226 F.Supp. 120 (S.D.Cal.1963); *Nina Ricci, S.A.R.L. v. ETF Enterprises, Inc.*, 203 U.S.P.Q. 947 (T.T.P.B.1979); *Faberge,* *Inc. v. Madison Shirt Corp.*, 192 U.S.P.Q. 223 (T.T.A.B.1976); *In re Cosmetically Yours, Inc.*, 171 U.S.P.Q. 563 (T.T.A.B.1971); *David Crystal, Inc. v. Estee Lauder, Inc.*, 167 U.S.P.Q. 411 (T.T.A.B.1970), *aff'd*, 476 F.2d 1373 (C.C.P.A.1973); *Villager Industries, Inc. v. Merle Norman Cosmetics, Inc.*, 164 U.S.P.Q. 215 (T.T.A.B.1969).

dition, the names for the most part were not ordinary surnames but names which in and of themselves had a quality of distinctiveness about them. While it is true that secondary meaning has developed for the Plaintiff's cosmetics, I do not believe that there is a close enough relation to the apparel line to result in confusion. In fact, Plaintiff's witnesses conceded that none of the wearing apparel which they have sold ever carried a sewn-in BLAIR label.

▮ A theory which is somewhat related is that a trademark owner should be given rights in its trademark, not only for the goods it actually sells, but for all product markets into which it might reasonably be expected to expand in the future. McCarthy, *Trademarks and Unfair Competition*, § 24:5, p. 177 (1984 ed.) This rule, however, is not without limits. "[T]he rule has been limited by a recognition that a senior user cannot by expansion prevail where the result would be a likelihood of confusion in derogation of established rights of the intervening user." *Id.*, p. 180. This is particularly true where the mark is a surname.

The evidence before me indicates that the Defendant has been marketing clothing under various plays on the mark BLAIR at least as early as the 1960s and that some form of the mark BLAIR has appeared in the sales literature of the Defendant as far back as 1909. The evidence also establishes that items of apparel have carried a label bearing the BLAIR mark or some derivation of the same.

Perhaps a threshold issue on this point is whether the Defendant can tack on the various plays on the mark BLAIR to establish prior rights as an intervening user of the BLAIR mark. "[I]t is a settled principle of trademark law that the dominant part of a mark may be given extra weight on the issue of likelihood of confusion." *Pizzeria Uno, supra* at 1530. The evidence establishes that the dominant portion of the various marks used by the Defendant in marketing its items of apparel was BLAIR. Focusing on the dominant parts of the marks and the product lines in question, I am of the opinion that the Defendant

has established prior rights to the use of the BLAIR mark in the apparel field and to allow the Plaintiff to expand into this area would likely result in further confusion. Therefore, I do not believe that the Plaintiff is entitled to protection under the expansion doctrine.

▮ This brings me to consider the evidence which is before me concerning actual confusion. There is some evidence of actual confusion on both sides; however, I am not convinced that the relief sought would totally alleviate the problem, particularly in light of the other compound forms of the mark to which the Defendant is entitled. The Defendant has an incontestable mark no. 1,094,807 issued June 27, 1978, BLAIR SHOPPE for retail home furnishings and store services. The Plaintiff has registered as of December 20, 1983, the mark BLAIR numbered 1,262,049 for the door-to-door retail merchandising of various goods including *inter alia* glassware and gift items. The BLAIR SHOPPE mark, however, is not challenged, and it would appear to me much easier to confuse the sale of glassware which the Plaintiff can market under its 1,262,049 BLAIR mark and the Defendant can market under the 1,094,807 BLAIR SHOPPE mark than it would be to confuse the Defendant's marketing of clothing under the BLAIR mark with the Plaintiff's marketing of perfume or cosmetics under the BLAIR mark. Plaintiff states that it would be satisfied with the addition of "John" or "John L." to the Defendant's BLAIR mark in the apparel field.

I do not believe that the addition of "John L." or "John" to the Blair mark in the apparel field will eliminate what putative confusion that exists. Under this compound form, BLAIR would remain the dominent portion of the mark, and I fail to see how its use would eliminate confusion. The Plaintiff cites the case of *Taylor Wine Co. v. Bully Hill Vineyards, Inc.*, 569 F.2d 731 (2d Cir.1978) for the proposition that adding a first name to a surname will often create a different commercial impression and that this would eliminate the problem; however, the Court was careful to add that "this is not a case where a first comer

seeks to save himself a place in a new market he has not yet entered by denying to a man the use of his own name in exploiting that market.... It is a truism that every product has its own threshold for confusion of origin." *Id.* at 733. The case before the Court is one where the first comer is seeking to save himself a place in a new market. Although both Plaintiff and Defendant market to the same general level of consumers, it is rather clear from the evidence that the Plaintiff has never marketed apparel to any extent, and this has been the Defendant's premier area. Even should this relief be granted, I believe that what confusion exists would persist.

This is not a unique problem. Faced with a similar set of facts, the court in *Scott Paper Co., supra,* at 1231, held that:

> [o]wnership of a trademark does not guarantee total absence of confusion in the marketplace. Selection of a mark with the common surname naturally entails a risk of some uncertainty and the law will not assure absolute protection.

Likewise, the court in *S.C. Johnson & Sons, Inc. v. Johnson,* 116 F.2d 427, 430 (2d Cir.1940), held that:

> [w]hen all is said, if a man allows the good will of his business to become identified with a surname so common as Johnson, it is fair to impose upon him some of the risk that another Johnson may wish to sell goods not very far afield; and he must show a substantial interest if he would seriously impair the second Johnson's privilege to use his own name in customary ways.

This is the case at bar. There is no equitable solution to the problem which would completely eliminate all confusion, therefore, the Court must fashion such relief as it deems appropriate. "Each case of trademark infringement must be evaluated on its own facts and circumstances." *Scott Paper, supra* at 1231. Considering the entire record before me I believe that there is "likelihood of confusion", but it is an acceptable minimum and under the facts of this case, it would be inequitable to disturb the status quo. Both parties in this action,

through the simultaneous development of their products, have developed a proprietary interest in the mark BLAIR; however, as indicated, that is limited to the extent of their secondary meaning.

Even if there were a finding of likelihood of confusion so as to warrant relief, the Plaintiff would only be entitled to such relief on a finding of priority.

> Priority depends ... upon whether the plaintiff can prove by a preponderance of the evidence that his mark possessed secondary meaning at the time the defendant commenced his use of the mark.

*Scott, supra* at 1231.

Regardless of when you measure the Defendant's first use of the BLAIR mark, the Plaintiff has failed to establish secondary meaning for the mark in the apparel field. The Defendant, therefore, has priority of the mark BLAIR with regard to apparel.

Therefore, I conclude that the parties should be restricted to the use of BLAIR in their respective fields. The Plaintiff may continue to market under BLAIR the personal and household use items listed under its incontestable marks. It will not, however, be able to market apparel under the BLAIR mark. The Defendant will be able to market apparel under the BLAIR mark and nothing else. Although this will not eliminate all confusion, I believe that it will hold it to an acceptable minimum.

## IV. TRADE NAME

As noted at the outset, unfair competition in the use of a trade name is a matter governed by the law of the state. *Rosso & Mastracco, Inc. v. Giant Food Shopping Center,* 200 Va. 159, 104 S.E.2d 776 (1958); *Kyhos v. Perpetual Savings and Loan Association,* 480 F.2d 204, 208 (4th Cir. 1973). The Virginia rule on unfair competition in the use of trade name requires two elements:

(1) plaintiff's name must have acquired secondary meaning;

(2) defendant has unfairly used plaintiff's name or one similar to the prejudice of plaintiff's interests.

*Rosso,* 104 S.E.2d at 780; *Kyhos, supra* at 208.

The Virginia Supreme Court went on to establish the "[o]ne who claims that his name has acquired a secondary meaning has the burden of proof, and that burden is a substantial one, that is, must be sustained by a fair preponderance of evidence or by substantial evidence sufficient to show that the use of the trade name by another will result to the prejudice of the complainant." *Rosso,* 104 S.E.2d at 780. The Court also added that unfair competition "is a question of fact or of mixed law and fact and each case must depend for its correct solution on its own peculiar facts and circumstances." *Id.* "Words ... are deemed to have acquired a secondary meaning when they have become associated in the minds of purchasers or customers with the source or origin of goods or services rather than with the goods or services themselves." *Id.*

■ Given the record which is before this Court, I fail to find where the Plaintiff has offered substantial evidence to prove secondary meaning with the BLAIR name in the apparel field, nor do I find that Plaintiff has proven that it will be prejudiced. The Plaintiff markets goods under the BLAIR name and mark which are not even offered by the Defendant under the similar name and mark. I fail to see how it could be prejudiced. The Plaintiff has not proven unfair competition by a preponderance of the evidence. Thus, the parties may continue to utilize the same trade names.