**VIRGINIA TECH FOUNDATION INC., Plaintiff,**

v.

**FAMILY GROUP LIMITED V, Defendant.**

Civ. A. No. 87–0081–R.

United States District Court, W.D. Virginia, Roanoke Division.

March 18, 1987.

---

## MEMORANDUM OPINION

KISER, District Judge.

The Plaintiff, Virginia Tech Foundation, Inc., ("Foundation"), instituted this action against the Defendant, Family Group Limited V, ("Family Group"), alleging trademark infringement and unfair competition. Contemporaneously with the filing of the suit, the Plaintiff filed a Motion for Preliminary Injunction. It is this motion which is before the Court for decision.

Plaintiff owns and operates a public radio station which is a member of the National Public Radio Network. On May 12, 1982, Plaintiff was assigned the call letters of WVTF, and it has used those call letters continuously as a means of station identification since that time. The Defendant has not challenged the assertion that the call letters qualify for trademark protection.

Defendant owns an independent television station to which the Federal Communications Commission ("FCC") assigned the call letters of WVFT on July 23, 1984. Both Plaintiff and Defendant serve substantially the same geographical market area, i.e. that area within approximately a 100–mile radius of Roanoke, Virginia. Plaintiff asserts that because of the similarity of the call letters, confusion is created in the minds of the public to the detriment of the Plaintiff. Defendant challenges the assertion that there is a likelihood of any confusion.

In the proposed Order tendered by the Plaintiff in conjunction with its Motion for a Preliminary Injunction, Plaintiff seeks to have the Court enjoin the Defendant to (1) apply to the FCC for new call letters; (2) cease using the present call letters and commence using the new call letters upon issuance by the FCC; (3) immediately cease using the present call letters in its promotional and advertising materials; and (4) use a disclaimer wherever the present call letters are used until new call letters are issued by the FCC.

The standard for the issuance of a preliminary injunction is well-settled in the Fourth Circuit. The seminal case is *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977), which articulated a four-factor test to be applied, i.e. (a) Plaintiff's likelihood of success in the underlying dispute; (b) whether Plaintiff will suffer irreparable injury if relief is denied; (c) injury to the Defendant if injunction is issued; and (d) the public interest. Subsequent decisions have refined *Blackwelder*, and it is now abundantly clear that the overriding consideration is the balance-of-hardship test. This is not to say that the other factors are to be disregarded. To the contrary, they are to be considered in conjunction with the balance-of-hardship test. It is apparent that a balance-of-hardship test subsumes factors (b) and (c) by requiring the Court to weigh the relative risks and hardships of the parties. Public interest factor (d) is a consideration whenever the public interest may be affected; however, it is rarely an important factor in private litigation where the public at large will not be affected such as here. Factor (a), Plaintiff's likelihood of success, is important in a relative sense. It is a factor which may increase or decrease the degree of probability of harm plaintiff

must prove. In *Dan River, Inc. v. Icahn,* the Fourth Circuit defined this relationship by quoting with approval from *North Carolina State Ports v. Dart Containerline Co.,* 592 F.2d 749 (4th Cir.1979). There it said:

> There is a correlation between the likelihood of plaintiff's success and the probability of injury to him. If the likelihood of success is great, the need for showing the probability of irreparable harm is less. Conversely, if the likelihood of success is remote, there must be a strong showing of the probability of irreparable injury to justify issuance of the injunction.

701 F.2d 278, 283 (4th Cir.1983).

Thus, in deciding the Plaintiff's Motion for Preliminary Injunction, the Court must determine the Plaintiff's likelihood of success on the underlying claims and weigh the harm which probably would be suffered by the parties if an injunction does or does not issue.

### A. Plaintiff's Likelihood of Success

Plaintiff's underlying claims [1] turn upon the question of whether the similarity of the call letters create a likelihood of confusion in the public's mind as to the source of the product. *New Process Co. v. Frances Denney, Inc.,* 670 F.Supp. 661 (W.D.Va. 1985) *aff'd,* No. 85–1131 (4th Cir. Jan. 2, 1986). Indeed, "likelihood of confusion refers to any type of confusion whether it goes to the source of a party's goods or services or as to a possible association, relationship, sponsorship between the parties and/or their goods and services." *Id.,* slip op. at 12. This Court undertook a rather lengthy exposition of the factors which are to be considered in determining whether there is a likelihood of confusion in *Denney,* and I will not undertake to reiterate what has been said there. Suffice it to say that there are many factors to be considered, some of which carry greater weight than others.[2]

In undertaking to prove a likelihood of confusion, the Plaintiff has focused almost exclusively upon the call letters in their simpliciter form: that is, the Plaintiff's proof by and large does not consider other visual or spoken matter used in conjunction with the call letters when the call letters are used. The Defendant's proof, on the other hand, does focus upon the use of the call letters in conjunction with other visual or spoken material and also upon the difference of the medium in which each party uses its respective call letters.

In presenting their respective positions, both parties called expert witnesses and, as one would expect, the hired guns did what they were hired to do. The experts, in my opinion, did more to obfuscate the problem than they did to clarify it. They undertook to describe in technical and polysyllabic jargon that which is obvious to the ordinary person with reasonably good vision and hearing. They undertook to tell me that the four letters in the call letters of the two stations either did or did not look alike and sound alike. In my judgment, this is a classic misuse of expert testimony, and I give very little weight to any of it.

Plaintiff had additional evidence of confusion in the form of testimony and exhibits regarding misdelivered mail, misdelivered furniture, mislabeled invoices and documents, and misdirected telephone calls. There were some twelve specific instances demonstrated by the exhibits and the testimony, and there was testimony that 50 to 75 pieces of misdirected mail had been received by the Plaintiff since October and that more than 100 telephone calls had been received, which were intended for the Defendant or inquired as to the Defend-

---

1. The discussion deals with the trademark claim but it would be equally applicable to the unfair trade practice claim because the Plaintiff must prove "unfair use." *See, New Process Co. v. Frances Denney, Inc.,* 670 F.Supp. 661 (W.D. Va.1985) *aff'd,* No. 85–1131 (4th Cir. Jan. 2, 1986).

2. In *Denney,* seven specific factors were identified. They are (a) strength of distinctiveness of the mark; (b) similarity of the two marks; (c) similarity of the goods/services the marks identify; (d) similarity of the facilities the two parties use in their business; (e) similarity of the advertising used by the two parties; (f) the defendant's intent; (g) actual confusion.

ant's telephone number. In contrast, Defendant presented evidence that it had not received any mail or other deliveries intended for Plaintiff. As to the misdirected telephone calls, Defendant explained that because a new telephone directory had not been published since it commenced operations in November, the public did not have access to a published telephone number for the television station.

It seems obvious to me that when you put the letters WVTF and WVFT side by side, there is a great visual similarity, and the chance for inverting the last two letters is substantial. When one speaks the letters, however, the sounds produced are not so similar. It is true that one may become confused when trying to deal with both sets of letters at the same time. This became apparent during the course of the trial. All concerned, including the Court, had to hesitate to choose the right set of letters, but one hearing the sounds made when the letters are spoken would be hard-pressed to say that they rhyme or sound alike. Be that as it may, I think the letters must be viewed in the context in which they are used by the parties in the operation and promotion of their respective broadcasting stations.

In my mind, it is important that the medium in which the call letters are used is different; the Plaintiff in radio and the Defendant in television. Although this does not of itself totally dispel confusion which may arise in the mind of the public as to the ownership and/or relationship of the parties, it does have the quality of demonstrating the use in different manners and in different areas. Another important factor in lessening confusion is the fact that the call letters themselves are not what I would consider a "strong mark." It is true that the Plaintiff's letters are distinct and non-descriptive and from that standpoint could be considered a "strong mark." However, when one considers that the call letters are assigned by the FCC for identification purposes (much as a social security number is) and they are predominantly used in conjunction with other descriptive material, their uniqueness becomes less important and the strength of the mark is weakened.

Moreover, all of the Defendant's promotional and advertising material used its call letters of WVFT in conjunction with a logo which emphasized the channel number superimposed upon a rectangle, and this bore no similarity to any of the advertising copy or promotional material used by the Plaintiff other than the fact that both parties did insert their call letters. Finally, to be weighed upon the Defendant's side of the case is the evidence that there has never been an intent upon the part of the Defendant to infringe or in any way benefit from the Plaintiff's mark. The uncontradicted testimony of both Fisher and Wheeler demonstrate that VFT was intended to be an acronym for Virginia Family Television, supporting a telecasting philosophy of family programming. Both testified they were not aware of Plaintiff's call letters until November of 1986 when Mr. Mills called it to their attention.

Although the Plaintiff may ultimately prevail on its claims, there is certainly some substantial doubt about it. Thus, to prevail on its motion, the Plaintiff must prove that the balance of hardships tilts in its favor. This it has not done.

### B. Balancing of Hardship

The Plaintiff had some evidence of misdirected listener contributions and lost money which, of course, could create a hardship. The main thrust of the Plaintiff's evidence, however, was that the ongoing perception of the public that the two entities are one and the same, or at least related, damages the Plaintiff's pristine image of being a non-profit, listener-sponsored, public-service radio station. Plaintiff urges that this not only will erode public confidence and diminish its good will, but will have a direct affect on its fund-raising efforts. I recognize that these are genuine concerns with the Plaintiff, and it is certainly possible that its fears are well-founded. But the harm that the Plaintiff points to is one of gradual erosion rather than some discrete cataclysmic event from which it would suffer irrevocable harm.

The Defendant, on the other hand, points to the fact that if it is enjoined in the manner the Plaintiff proposes, it would be necessary for it to change its promotional materials, letterheads,. business cards, and on-the-air identification. The most serious problem the Defendant points to, however, is the manner in which the television rating services conduct and publish their ratings,[3] which are central to the Defendant's ability to carry on its business. It may be overstated, but the general partner of the Defendant, Ian Wheeler, predicted that it would lead to a demise of the Defendant's business. Whether overstated or not, I find that the Defendant stands to lose a great deal more than the Plaintiff by the entry of an injunction.

Generally speaking, the purpose of a preliminary injunction is to preserve the status quo unless by continuing the status quo the Plaintiff's relief would be nullified by the continuation of an existing condition. However, the Plaintiff is not asking the Court to preserve the status quo, but to change it. The conditions which exist now have exited since November 7, 1986, and to permit them to continue to exist until this case is heard on the merits will not be nearly as harmful to the Plaintiff as would requiring the Defendant to abandon use of its present call letters and change its advertising and promotional material accordingly. If Plaintiff were granted a preliminary injunction, it would, in effect, have prevailed on the underlying lawsuit without ever having had to try it because it would be highly unlikely that the Defendant would or could change back to its original call letters once it had been forced to abandon them. At worst, the only harm the Plaintiff stands to suffer is a continued gradual erosion of its image for a matter of a few months before the case is tried. The Defendant, though, would suffer an immediate tangible loss of its use of advertising and promotional material as well as the benefit of its assigned call letters.

In sum, I find that the Plaintiff's chances of prevailing on the underlying claim are not strong and that the hardships the Defendant would suffer if the Court were to grant the injunction substantially outweigh the hardships that the Plaintiff will suffer by the Court's denying the injunction. Accordingly, an Order will be entered denying the Plaintiff's Motion for Preliminary Injunction.

---

3. The testimony revealed that the rating services take their samples by use of the television stations' call letters and also publish the results by use of the call letters. Samplings are taken four times a year and published. The publication is referred to as "a book" for each quarter. The book is then used by the station to demonstrate to potential advertisers the size of the station's audience.