8/15/01

THIS DISPOSITION
IS CITABLE AS PRECEDENT
OF THE T.T.A.B.

Paper No. 10
JQ

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

In re Infinity Broadcasting Corporation of Dallas
_____

Serial No. 75/689,077
_____

Robert P. Lenart for applicant.

Andrew J. Benzmiller, Trademark Examining Attorney, Law Office 113 (Meryl Hershkowitz, Managing Attorney).
_____

Before Seeherman, Quinn and Holtzman, Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

An application was filed by Infinity Broadcasting Corporation of Dallas to register the mark KYNG for "radio broadcasting services."[1]

The Trademark Examining Attorney refused registration under Section 2(d) of the Trademark Act on the ground that applicant's mark, when used in connection with applicant's services, so resembles the previously registered marks

_____

[1] Application Serial No. 75/689,077, filed April 21, 1999, alleging first use and first use in commerce on March 9, 1992.

KING-TV for "television broadcasting services"[2] and KING FM

for "radio broadcasting services"[3] as to be likely to cause

confusion.  The registered marks are owned by the same

entity.

When the refusals were made final, applicant appealed.

Applicant and the Examining Attorney have filed briefs.  An

oral hearing was not requested.

### Applicant's Arguments

Applicant contends that the marks differ in

appearance, sound and meaning.  Applicant goes on to argue

that commercial radio and television station call letters

are assigned by the Federal Communications Commission; that

the call letters must be broadcast hourly; and that they

are broadcast by pronouncing the individual letters in

sequence, not as words.  Applicant points to its specimen

that is an audio cassette tape (bearing a label showing use

of "KYNG-FM") of an on-air broadcast in which the mark is

pronounced as a series of letters.  Applicant also asserts

that the respective marks are used in different markets,

with applicant's broadcasting country music in Dallas,

Texas and registrant's broadcasting classical music in

---

[2] Registration No. 1,503,302, issued September 6, 1988; combined
Sections 8 and 15 affidavit filed.
[3] Registration No. 2,059,389, issued May 6, 1997.  The
designation "FM" is disclaimed apart from the mark.

Ser No. 75/689,077

Seattle, Washington. Applicant asserts that its customers are sophisticated purchasers, maintaining that commercial radio stations do not obtain any revenue from listeners, and that the consumers of a radio station's services can only be the advertisers who pay the radio station for its broadcasting services. Applicant points to a district court decision between it and a third party involving a claim of likelihood of confusion wherein the court noted that purchasers of radio broadcasting services are advertisers and that they are sophisticated. In that case, the court found no likelihood of confusion between the use of WBCN and WBCS by different radio stations in the same geographical market. Infinity Broadcasting Corp. v. Great Boston Radio, II, Inc., 32 USPQ2d 1925 (D.C. Mass. 1994). Applicant asserts that the case offers a "rational approach" for deciding the present appeal.

## Examining Attorney's Arguments

The Examining Attorney maintains that the marks are similar in sound, appearance and overall commercial impression. The Examining Attorney contends that applicant's mark, when spoken aloud as a service mark (as opposed to mere call letters), will be pronounced as "KING." With respect to the services, they are identical with respect to Registration No. 2,059,389, and closely

3

related with respect to Registration No. 1,503,302. In this connection, the Examining Attorney submitted third-party registrations showing that entities have registered their marks for both radio and television broadcasting services. The Examining Attorney also maintains that in addition to advertisers, the listeners to radio and viewers of television must be considered consumers of the stations' broadcasting services. With respect to the argument that the services are separated geographically, the Examining Attorney points out that federal trademark registrations are nationwide in scope and that radio broadcasts are offered on the Internet and, thus, may be accessed anywhere in the country.

## Analysis

It is clear from the record, as well as applicant's and the Examining Attorney's arguments, that both applicant's and registrant's marks are call letters. The Board determined in 1985 that radio call letters were registrable in the case of In re WSM, Inc., 225 USPQ 883, 884 (TTAB 1985). At the outset, we offer a bit of perspective set forth in that case with respect to obtaining particular call letters from the Federal Communications Commission:

The FCC [Federal Communications Commission] licenses applicant to broadcast from a specified geographic location on a specified frequency at a specified power during specified times. 47 U.S.C. 303(c). The FCC exercises its authority under 47 U.S.C. 303(o) to "designate" call letters for licensed broadcasters by permitting the broadcasters to request whatever call letters they like. Prior to 1984 the requests were granted unless: (1) another station had the same call letters, (2) the requested call letters were not in good taste, or (3) the requested letters were phonetically and rhythmically similar to existing call letters of stations in the same area, so that the stations would likely be confused. Prior to 1984 the FCC administered a system whereby one licensed station could object to the approval of another station's call letters, but only if both stations were to serve the same area. These disputes between broadcasters were resolved by the FCC. The interests of anyone who was not a broadcaster were never considered by the FCC.

In 1984 the FCC rules regarding call letter approval and conflicts were changed. The agency will now grant a request for particular call signs if the identical call sign is not already in use by someone else, and the FCC is no longer a forum for the resolution of disputes between stations. Section 73.3550(g) of the FCC Rules now provides as follows:

  [A]pplicants may request call signs of their choice if the combination is available. Objections to the assignment of requested call signs will not be entertained at the FCC. However,

Ser No. 75/689,077

> this does not hamper any party
> from asserting such rights as it
> may have under private law in
> some other forum.  Should it be
> determined by an appropriate
> forum that a station should not
> utilize a particular call sign,
> the initial assignment of a call
> sign will not serve as a bar to
> the making of a different
> assignment.
>
> It is clear that the FCC is not
> the owner of the call letters used by
> the broadcasters which it regulates.
> The right to broadcast is what the
> agency licenses to broadcasters.  The
> right to use the call letters is not
> licensed in a trademark sense.  The FCC
> neither adopts nor uses call letters as
> service marks, so it does not own any
> such marks.  Even prior to its new
> rules the agency did not assert
> ownership of call letters.  It acted
> only as a third party to resolve
> disputes between the owners of the call
> letters, the broadcasters who actually
> use them.

Id. at 884.

In the time since the FCC changed its rules, there have been a number of decisions involving likelihood of confusion between broadcasting call letters.  See, e.g.: Infinity Broadcasting Corp. v. Greater Boston Radio II, Inc., supra; Pride Communications v. WCKG Inc., 851 F.Supp. 895, 30 USPQ2d 1185 (N.D. Ill. 1994); Virginia Tech Foundation, Inc. v. Family Group, Limited V, 666 F.Supp. 856, 2 USPQ2d 1961 (W.D. Va. 1987); Pathfinder

Communications Corp. v. Midwest Communications Co., 593 F.Supp. 281, 224 USPQ 203 (N.D. Ind. 1984); USA Network v. Gannett Co., 584 F.Supp. 195, 223 USPQ 678 (D. Colo. 1984); and Draper Communications, Inc. v. Delaware Valley Broadcasters Ltd. Partnership, 229 USPQ 161 (Del. Ch. 1985). These courts, in determining likelihood of confusion issues, have treated call letters in the same way as any other service mark. See: 1 J. T. McCarthy, *McCarthy on Trademarks and Unfair Competition*, §7:12 (4th ed. 2001).

Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. In re E. I. du Pont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. Federated Foods, Inc. v. Fort Howard Paper Co., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

We first turn to the similarities between applicant's mark KYNG and registrant's marks KING-TV and KING FM. We find that the marks, when considered in their entireties, are similar in sound, appearance and meaning. In comparing the marks, we have considered the presence of "TV" and "FM"

in registrant's respective marks. However, "there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided [that] the ultimate conclusion rests on consideration of the marks in their entireties." In re National Data Corp., 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). For example, "that a particular feature is descriptive or generic with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark..." Id. at 751.

In the present case, registrant's marks are dominated by the "KING" portion. The terms "TV" and "FM" clearly are descriptive and/or generic when used in connection with television broadcasting services and radio broadcasting services, respectively, and have no source-identifying value. Thus, these two terms are subordinate to the dominant portion.

The dominant portion KING in registrant's mark and applicant's mark KYNG are similar in appearance. Not only do they differ by only one letter, but this letter is the second letter in each mark, and in each mark is a vowel surrounded by the same consonants in the same order. As a result, they present strongly similar visual similarities.

With respect to sound, the terms "KING" and "KYNG," if pronounced as "words," are phonetic equivalents. The letter "y" often has the sound of a short "i" (as, for example, in the word "system"), and it is logical that the letter "Y" in applicant's mark would be pronounced as such given the visual similarity between applicant's mark and the word "king." Further, we are not persuaded by applicant's argument regarding the letter-by-letter pronunciation of the marks when they are broadcast over the airwaves. The letters "I" and "Y" sound very much alike, as would "K-Y-N-G" and "K-I-N-G." The letters may also be pronounced as the term "king" by announcers when not doing the federally required announcement, and may be shortened to the single syllable "king" by listeners. It would not surprise us if applicant's mark, when spoken on the radio or used in promotional activities, were pronounced as the term "king" (as in, "you are listening to the king of country music in Dallas").

As to meaning, our view is that applicant's mark "KYNG", when viewed as the phonetic equivalent of the term "KING," would convey the meaning of the commonly understood

term "king," that is, the same meaning conveyed by registrant's marks.[4]

In sum, the marks, when considered in their entireties, engender similar overall commercial impressions.

We next turn to a comparison of the services. The services are legally identical in that both applicant's and registrant's services are identified as "radio broadcasting services." Further, applicant's "radio broadcasting services" are closely related to registrant's "television broadcasting services."

As is obvious, registrant itself renders both types of services under virtually identical marks (differing only in the descriptive and/or generic designations "TV" and "FM"). Further, registrant's situation is not unique in the broadcasting industry. The Examining Attorney has submitted several third-party registrations based on use. The registrations show that entities have registered their marks for both television and radio broadcasting services. Although these registrations are not evidence that the marks shown therein are in use or that the public is

---

[4] If applicant's mark were to be strictly perceived as a letter mark, we recognize that the mark would have a connotation different from the "word" pronunciation of KING-FM and KING-TV.

10

familiar with them, they nevertheless have probative value

to the extent that they serve to suggest that the services

listed therein, including television and radio

broadcasting, are of a kind which may emanate from a single

source.  See, e.g., In re Albert Trostel & Sons Co., 29

USPQ2d 1783, 1785-86 (TTAB 1993); and In re Mucky Duck

Mustard Co. Inc., 6 USPQ2d 1467, 1470 at n. 6 (TTAB 1988).

In attempting to distinguish the services, applicant

argues as follows (Brief, p. 4):

> [S]ince the applicant's mark and the
> marks in the cited registrations are
> used in connection with different radio
> stations located in different markets,
> the channels of distribution used by
> applicant and the owner of the cited
> registrations are clearly different.
> The applicant uses the mark in
> connection with a radio station in
> Dallas, Texas, while the marks in the
> cited registrations appear to the [sic]
> used in connection with radio and
> television stations in Seattle,
> Washington.  Thus, the services covered
> by the marks are performed in different
> markets.

Given that registrant's registrations encompass

nationwide rights, and that applicant is seeking a

geographically unrestricted registration, applicant's

argument is unavailing.  This argument highlights, however,

a notable difference between situations involving the *use*

of call letters (for example, as determined by the FCC or

11

through trademark infringement litigation in a civil action) versus Office proceedings such as this one, which involve the right to a geographically unrestricted federal service mark *registration*.  See:  Pathfinder Communications Corp. v. Midwest Communications Co., supra at 204 ["Implicit in the FCC's relinquishment of its role as arbiter of call letter disputes is the conclusion that, when local courts resolve call letter disputes, the law of that local forum and circuit would apply."].  If a geographically unrestricted registration were to issue to applicant, the registration would give applicant certain presumptions under Section 7(b) of the Trademark Act, including a presumption of applicant's exclusive right to nationwide use of the registered mark in commerce in connection with radio broadcasting services.[5]  These nationwide rights are different from those arising from territorial use.  That is to say, in Board proceedings, likelihood of confusion is determined independent of the context of actual usage.  In an infringement action, on the other hand, the context of the use of the marks is

---

[5] We note applicant's statement that registrant has a website on the Internet at www.king.org (response, March 11, 2000), and the Examining Attorney's statement that "online broadcasts are offered via the Internet [that] can be accessed anywhere in the country" (brief, p. 7).  Although there is no evidence of record on these points, it is common knowledge that radio broadcasts may be heard in realtime on the Internet.

relevant. See, e.g., Jim Beam Brands Co. v. Beamish & Crawford, Ltd., 937 F.2d 729, 19 USPQ2d 1352 (2d Cir. 1991). See also: *McCarthy on Trademarks and Unfair Competition*, supra at §§32:82 and 32:100. For this reason, infringement cases in which no likelihood of confusion has been found because the marks are used in different geographical areas are not helpful to our analysis in this appeal.

Applicant also argues that in the case of radio and television broadcasting services, the relevant purchasers of such services are advertisers, and the likelihood of confusion analysis should focus on these purchasers. Applicant contends that these purchasers "are sophisticated and would not be likely to buy advertising time on the applicant's station thinking that they were buying time on the registrant's station." (Brief, p. 6) Further, applicant argues that "[c]onfusion on the part of listeners is considered to be irrelevant to this analysis, but even such confusion is unlikely in view of the geographic separation between the applicant's station and the registrant's station." (Id.).

Applicant has cited to cases wherein courts have identified advertisers as the purchasers of radio broadcasting services. See, e.g., Infinity Broadcasting

Corp. v. Great Boston Radio, II, Inc., <u>supra</u>. We agree that advertisers comprise one of the classes of purchasers of applicant's and registrant's services, and that they are likely to be sophisticated when it comes to buying advertising time on the airwaves.

We also find, however, that the public at large who watches television and listens to radio comprises another class of consumers that is relevant to our likelihood of confusion analysis. Although these individuals do not "purchase" broadcasting services in the sense that they pay for such services (other than, for example, paying for cable television, satellite television, premium channels and the like), the broadcast services are certainly directed to this class that "uses" the services, and likelihood of confusion among viewers and listeners is relevant. As the Federal Circuit stated in Electronic Design & Sales Inc. v. Electronic Data Systems Corp., 954 F.2d 713, 21 USPQ2d 1388, 1390 (Fed. Cir. 1992):

> For determining likelihood of confusion..."relevant persons" is not always limited to purchasers, past or future. For some owners of marks, such as the American Red Cross with its well-known mark, there are no purchasers. In these instances, "relevant persons" would encompass all who might know of their services and then become purchasers of goods or services of others.

See also:  Payless Shoesource Inc. v. Reebok International

Ltd., 998 F.2d 985, 27 USPQ2d 1516, 1519 (Fed. Cir.

1993)["[S]everal of our sister circuits have recognized

that an action for trademark infringement may be based on

confusion of consumers other than direct purchasers..."].

The Board also has weighed in with its view on this point

in the case of In re Artic Electronics Co., Ltd., 220 USPQ

836, 838 (TTAB 1983):

> We concur entirely with the contentions
> of the Examining Attorney that in
> addition to source confusion among
> buyers, source confusion among ultimate
> users of the goods...is both likely and
> encompassed with the confusion
> proscriptions of Section 2(d).  The
> notion that likelihood of confusion is
> limited to purchaser confusion is
> simply not correct.  The 1962
> amendments to the Trademark Act, both
> in its sections relating to standards
> for refusal of registration and for
> trademark infringement, explicitly
> deleted the qualifying term
> "purchasers" after referring to marks
> likely "to cause confusion, or to cause
> mistake or to deceive," thereby
> evincing an intention to remove any
> limitation of such standards to
> purchasers of goods.

In view thereof, it is clear that likelihood of confusion

under Section 2(d) encompasses situations when even

relevant non-purchasers are confused, mistaken or deceived.

Therefore, applicant's contention that listeners of radio

Ser No. 75/689,077

are irrelevant to the analysis is not persuasive.  See
generally:  *McCarthy on Trademarks and Unfair Competition*,
supra at §23:7.

Everyday listeners of radio or viewers of television
are not likely to exercise anything more than ordinary care
when distinguishing between the call letters of the
broadcasting stations.  With respect to these everyday
listeners and viewers, we have kept in mind the normal
fallibility of human memory over time and the fact that
consumers retain a general, rather than a specific,
impression of trademarks/service marks encountered in the
marketplace.  See:  Weiss Associates Inc. HRL Associates
Inc., 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990).

As a closing thought, we would add that a
determination of likelihood of confusion involving call
letters, while governed by the *du Pont* factors, presents
some special difficulties.  We recognize that the FCC
issues licenses to parties to use very similar call
letters, and that the public is aware that call letters for
separate radio and television stations may vary by just one
letter.  As a result, call letters may be able to be closer
to each other without causing likelihood of confusion than
would be the case for other marks for other goods or
services.  Our finding of likelihood of confusion in this

16

case should not be read as asserting a principle that confusion is likely if call letters for radio or television broadcasting services differ by just one letter.  Here, we have found the marks to be confusingly similar because of the identity of the remaining letters and the similarity of the differing letters in terms of the similar effect of those letters in the marks as a whole, as discussed supra.

Lastly, to the extent that any of the points argued by applicant cast doubt on our ultimate conclusion on the issue of likelihood of confusion, we resolve that doubt, as we must, in favor of the prior registrant.  In re Hyper Shoppes (Ohio), Inc., 837 F.2d 463, 6 USPQ2d 1025 (Fed. Cir. 1988); and In re Martin's Famous Pastry Shoppe, Inc., 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984).

Decision:  The refusals to register are affirmed.